## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLOTTE D. CARROLL, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-09-1876 |
| | § | |
| TEXAS DEPARTMENT OF PUBLIC SAFETY, | § | |
| | § | |
| *Defendant*. | § | |

### MEMORANDUM AND ORDER

Pending before the court are defendant Texas Department of Public Safety's ("TXDPS") motion for summary judgment (Dkt. 33), plaintiff Charlotte D. Carroll's motion to strike (Dkt. 38), which is contained within her response to TXDPS's motion, and TXDPS's motion to strike (Dkt. 46), which is contained within its reply to Carroll's response.  Having considered the motions and associated filings as well as the applicable law, the court is of the opinion that TXDPS's motion for summary judgment (Dkt. 33) should be GRANTED, that Carroll's motion to strike (Dkt. 38) should be DENIED AS MOOT, and that TXDPS's motion to strike (Dkt. 46) should be OVERRULED.

### I. BACKGROUND

Plaintiff Charlotte D. Carroll, an African-American female, has been employed by TXDPS for more than twenty years and is currently a Senior Trooper in good standing.  Dkts. 20, 38.  She is also a retired military reservist who served as a Staff Sergeant with the U.S. Army and was a member of the U.S. Army Reserve at all times relevant to this lawsuit.  Dkts. 33, 38.  In September 2006, Carroll returned to her job at TXDPS after serving four years of active military duty.  *See id.*  Upon her return, she initially worked at the Driver's License Division, Tidwell Road office, under Sergeant Clarence Magee.  Dkt. 33.  In October 2007, TXDPS transferred Carroll to the Humble

office.  Dkt. 38.  Sergeant Alfred Saucedo was her supervisor until May 2008, when Sergeant Delvin

Davis became her supervisor.  *Id.*  Carroll claims that Magee and Davis discriminated against her

and created a hostile work environment, and that TXDPS retaliated against her after she filed

discrimination claims internally and with the Equal Employment Opportunity Commission

("EEOC").  Carroll also claims that TXDPS failed to pay her overtime under the Fair Labor

Standards Act.

## A.    Tidwell Office

Bobby Winslow, a male Senior Trooper, and Carroll were the only troopers assigned to the

Tidwell office.  *See id.*  Magee was in charge of both the Tidwell office and the Liberty Driver's

License office.  *See id.*  There were no troopers permanently assigned to the Liberty office, so Magee

would sometimes assign one of the troopers from the Tidwell office to make the 45-minute drive to

Liberty and to "bring any type of documents, information that [he had] at the Tidwell office to the

Liberty office and pick up their documents or weekly reports, include supplies, and bring them back

to the Tidwell office."  Dkt. 34, Exh. B. at 45.  Additionally, the trooper would sometimes "do road

tests, . . . type, . . . have investigations, . . . or assist local officers."  *Id.* at 47-48.

Sometimes Magee would take care of the duties at the Liberty office himself.  Dkt. 41 (Dkt.

38, Exh. B)[1] at CARROLL 002582.  At other times, he would ask Winslow to go to Liberty.  *Id.*

Magee estimated, for one six-month period, that Winslow went to Liberty approximately thirteen

times, he had gone approximately eight times, and Carroll had gone "maybe once."  *Id.*  Carroll

claims that when Winslow went to the Liberty office, he "oftentimes checked out for the entire day

---

[1]  Carroll used multiple docket entries to file Exhibits A and B to her response.  Rather than
citing to the exhibit letter, the court will cite to the docket number at which document to which it is
citing is located.

without having to establish either his whereabouts or what he had done with his time." Dkt. 38 at 8.

Carroll alleges that Magee discriminated against her by allowing Winslow to help with the Liberty office duties and not allowing her the same opportunity. Dkt. 38. Magee claims that he did not assign the "Liberty run" to Carroll because when he initially took her to the Liberty office to meet the staff, she made very little effort to get to know them and instead spent most of the time that they were there in a different office speaking to a Veterans Affairs officer. Dkt. 33; Dkt. 34, Exh. B. Magee claims that he "made a supervisory decision that it would be in the best interest of the Liberty employees" to require Carroll to work at the Tidwell office, rather than the Liberty office. Dkt. 33; Dkt. 34, Exh. B.

Carroll also alleges that she had to conduct more driving tests than Winslow and that Magee gave Winslow extra time to complete his reports and did not give extra time to Carroll. Dkt. 38. Additionally, Carroll claims that Magee routinely interfered with her military training by complaining about the leave she took for military training and interfering with her duties as a reservist. Dkt. 20. Magee claims that he became concerned with Carroll's use of sick time, the number of hours she spent working secondary jobs,[2] and her continuing military obligations. Dkt. 34 (citing Dkt. 34, Exh. D (notes from Magee to Carroll about leave requests)). Magee therefore required that Carroll provide a copy of military orders at least two weeks prior to departing for military duty so that he could make appropriate arrangements. *Id.* He also required her to give him 72-hours advance notice of schedule changes due to doctor's appointments and secondary

---

[2] Commissioned members of TXDPS have the privilege of working secondary jobs, which are generally security-related. TXDPS policy requires that the troopers obtain written permission before beginning any secondary employment, and troopers whose performance is unsatisfactory are not permitted to work secondary jobs. *See* Dkt. 33 at 16-17.

employment.  *Id.*; *see* Dkt. 34, Exh. D at CAROLL_002697 (memo requiring notice).  Carroll clams that this requirement was discriminatory because Magee did not require Winslow to give advance notice of leave.[3]  Magee testified, however, that he specifically needed Carroll to give more advance notice "because she was constantly giving me doctor's appointments at the last minute . . . So it's important that she give me advance notice so I can make sure that the office is covered and that we can provide the customer service to the public."  Dkt. 34, Exh. B at 191:21-192:9.

Carroll additionally alleges that Magee discriminated against her by requiring a medical status report after she had surgery, in violation of the Family Medical Leave Act ("FMLA").  Carroll states that "Magee's behavior would have been actionable as interference with Carroll's exercise of her right to FMLA."  Dkt. 38.  Carroll does not make any claims under the FMLA, per se, but she alleges that Magee's requirement of a status report when one would not be required under the FMLA is "harassment, plain and simple."  *Id.* at 17.  Magee claims that he asked Carroll to complete the form every 30 days "to determine whether a temporary assignment was feasible."  Dkt. 33 at 16.

Carroll claims that she complained to her lieutenant about Magee's behavior, but the lieutenant took no action.  Dkt. 20.  She filed a complaint with the EEOC relating to Magee's behavior in June 2007.  *Id.*

## B.    Humble Office

In September 2007, Carroll was transferred to the Humble Drivers License office.  Dkt. 20.  Her first supervisor in Humble was Sergeant Alfred Saucedo.  Dkt. 33.  Carroll has no complaints

---

[3]  Carroll presents evidence of one instance where Winslow took time off with only one day of advance notice.  *See* Dkt. 38 at 12 (citing testimony from Winslow and Magee).  Carroll was scheduled to be off on this same day.  The evidence suggests that Magee closed the office that day so that both Winslow and Carroll could be off.  *See id.* at 13 (quoting an email from Magee on February 8, 2007 which stated, "On Friday 02/09/07, I will be in the office at 830 a.m. to close office, so Trooper Carroll will not be inconvenience[d]").

about her tenure under Saucedo; her 2007 performance evaluation demonstrates that she met expectations on all of her duties and exceeded expectations with regard to "public contacts." Dkt. 38; Dkt. 41 (Exh. B) at CARROLL 004367-68.  In May 2008 Sergeant Delvin Davis became Carroll's supervisor. Dkt. 38.  Carroll alleges that Davis discriminated against her and created a hostile work environment by counseling her for alleged infractions of TXDPS rules and procedures numerous times and by giving her a negative performance evaluation.  *Id.*

Davis issued written counseling reports or gave official departmental memoranda to Carroll several times in 2008.  On May 9, 2008, Davis counseled Carroll for losing her handcuff key.  Dkt. 38 & Exhs. A&B.  Carroll states that she did not lose the key; rather, it was in the pocket of a uniform that went to the dry cleaners.  *Id.*  On September 5, 2008, Davis counseled Carroll for converting four days of military leave that she had taken in July 2008 to vacation without having the original approval for leave amended.  *Id.*  Carroll claims that she did not need to obtain approval to convert her military leave to vacation leave because the original approval, which was for a period of time for both vacation and military leave, did not differentiate between the two types of leave. *Id.*  On October 20, 2008, Davis counseled Carroll for failing to make a bank deposit upon the close of business in September 2008.  *Id.*  Carroll states that she could not make the bank deposit at the close of business because her patrol unit was not operational.  *Id.*  In October or November 2008, Davis counseled Carroll for failing to conduct business in a straightforward manner and obey commands of superiors in connection with the counseling she received regarding the bank deposit. *Id.*  Carroll states that she did not sign her counseling record regarding the bank deposit counseling before the end of the day because she needed to transport a prisoner, and Davis required her to return that night to sign it in order to provoke and humiliate her.  *Id.*  On November 7, 2008, Davis counseled Carroll for disobeying an order not to drive her personal vehicle to work in November

5

2008.  *Id.*  Carroll states, first, that Davis did not require the male trooper, Rivera, to drive his patrol unit to work.  Second, Carroll claims that she had driven her patrol unit to work the day before and left it in a safe place as required by the TXDPS manual.  *Id.*  On November 26, 2008, Davis again counseled Carroll for failing to conduct business in a straightforward manner.  *Id.*

Carroll claims that Davis treated Rivera more favorably than he treated her.  First, as noted above, Carroll claims that Davis required Carroll, but not Rivera, to drive a patrol unit, rather than a personal vehicle, to work.  Second, Carroll presents evidence that in November 2008 Davis denied Carroll's use of vacation, comp time, and/or holiday comp until further notice, but he still allowed Rivera to use comp time and take days off.  Dkt. 38 at 23 & Exh. A at PLAINTIFF 000320, PLAINTIFF 000356.  Third, Carroll claims that Davis had computer access at work and she did not.  Dkt. 38 at 27; Dkt. 41-1 at CARROLL_004630.

On December 8, 2008, Carroll filed a report of unprofessional conduct/harassment against Davis.  Dkt. 38.  On February 4, 2009, Davis claims that he ordered Carroll to return to work and that she did not do so.  Dkt. 33.  Carroll states that she spoke to Davis on her cell phone that day and did not hear Davis tell her to come into the office.  *Id.*  Davis learned about Carroll's report against him for unprofessional conduct on February 5, 2009, and he gave Carroll her 2008 Performance Evaluation on the same day.  Dkt. 38.  Davis rated Carroll's performance as "unacceptable" in the areas of "compliance with rules" and "accepts direction."  *Id.*  On February 9, 2009, Davis counseled Carroll for her alleged failure to return to the office as ordered on February 4, 2009.  Dkt. 33.

## C.    Military Leave and Secondary Employment

TXDPS has a policy that prohibits its officers from working secondary employment on the same day on which they are serving on active duty with the military.  Dkt. 33.  Carroll disagreed with the policy, and she submitted a request to Davis, which was forwarded to Captain Norma Garza-

6

Jennings, on July 15, 2008 (while she was on leave) requesting an exception to the policy.  Dkt. 34, Exh. D at CARROLL_000893.  Garza-Jennings recommended that the request be denied and forwarded the request to Director Thomas A. Davis, who issued a memorandum denying Carroll's request on July 31, 2008. Dkt. 34, Exh. D at CARROLL_000893-94.  Carroll also complained about the policy to Lieutenant Kellye Turner, who was conducting a random inspection of the Humble office on July 11 and 16, 2008.  Dkt. 34, Exh. D at CARROLL_005618.  In August 2008, Carroll turned in corrections to her forms requesting military and vacation leave in July 2008, which changed some of the time she previously claimed as military leave to vacation time.  *See* Dkt. 34, Exh. D at CARROLL_005933-34.  She worked secondary jobs on at least some of the days that she later converted to vacation leave.  *See* Dkt. 34, Exh. D at CARROLL_005724-25.  As noted above, Davis counseled Carroll for submitting this change in September 2008.  On November 4, 2008, TXDPS claims that Carroll worked a secondary job at Ben Taub Hospital on the same day that she was supposed to be on military duty.  Dkt. 33 at 22.  Carroll claims she was not on military duty on that date. Dkt. 38 at 27.  On November 18, 2008, Garza-Jennings sent a memorandum to all TXDPS staff in her region reminding them of the military leave policy.  Dkt. 33 at 22 & Exh. D at 5578.  In this memorandum, Garza-Jennings specifically informed the region TXDPS staff that personnel "on military leave for routine training or extended activation cannot engage in secondary employment or DPS Step while on the designated military leave."  Dkt. 34, Exh. D at 5578.  However, Carroll worked a secondary job on November 18, a day on which she had military leave.  Dkt. 34, Exh. A at 175-180.

In January 2009, Scott Shillingburg, a Lieutenant with whom Magee and Davis had consulted regarding Carroll's use of leave, wrote a memo relating to Carroll's use of leave to the Driver License Division Chief, Judy Brown, recommending that Carroll's secondary employment and STEP

7

privileges[4] be suspended for six months.  Dkt. 33 & Exh. D at 7156-57.  Shillingburg additionally recommended that Carroll should be rated as "unacceptable" in the area of "compliance with rules" on her performance evaluation.  *Id.*  Garza-Jennings sent Shillingburg an email recommending that Carroll should also be rated as "unacceptable" in the "accepts direction" category.  *Id.* at 7158. Davis presented Carroll with a performance evaluation that rated her performance as unacceptable in both of these categories on February 5, 2009.  *See* Dkt 33, Exh. D at CARROLL_004369-71; Dkt. 38 at 29.  On February 6, 2009, Garza-Jennings send Carroll a memo suspending her secondary employment and STEP privileges until her performance improved.  Dkt. 34, Exh. D at CARROLL_000901.

Carroll formally appealed her evaluation in March 2, 2009.  *See* Dkt. 33 at 23.  On March 9, 2009, Garza-Jennings opened a personnel complaint against Carroll alleging that Carroll engaged in secondary employment on the same day she was on military duty from July 21-24, 2008 and November 3-4, 2008.  *Id.* at 23-24.  The complaint also alleged that Carroll falsified a weekly time report in November, claiming that she was on military duty when she was not, that Carroll was insubordinate on October 20, 2008, and that Carroll failed to report to duty even though she was ordered to do so in early December 2008 and again in early February 2009.  *Id.* at 24.  On March 10, 2009, Carroll filed an EEOC charge.  *Id.*  On March 13, 2009, Brown requested permission to open a criminal investigation relating to Carroll's alleged timekeeping discrepancies with regard to her military leave.  *Id.*  Permission was granted, and the Texas Rangers conducted an investigation.  *Id.* TXDPS suspended the personnel complaint while the investigation was pending.  *Id.*  The evidence was presented to the Harris County grand jury twice.  *Id.*  The grand jury declined to indict her.  *Id.*

---

[4]  STEP is a federally funded program that allows law-enforcement to conduct additional traffic patrols.  "STEP" stands for "Selective Traffic Enforcement Program."  Dkt. 33 at 22 n.13.

8

TXDPS has not taken any additional action on the personnel complaint.  *Id.* at 25.  Carroll claims that the personnel complaint, criminal investigation, and grand jury charges were pursued in retaliation for her internal and EEOC discrimination charges.  Dkt. 38.

Carroll received a right-to-sue letter for her EEOC charge relating to Magee, which was filed in June 2007, on May 4, 2009.  Dkt. 20.  She filed her initial complaint in this case on June 16, 2009.  Dkt. 1.  She received a right-to-sue letter for the second EEOC charge on December 23, 2009, and she filed her second amended complaint, adding claims relating to the second EEOC charge, on December 30, 2009.  Dkt. 20.

TXDPS claims that Carroll's claims fail as a matter of law because the actions taken by Magee and Davis were not taken on account of Carroll's protected status.  Dkt. 33.  Additionally, TXDPS claims that it had a legitimate, non-discriminatory reason for taking the actions that Carroll claims were retaliatory.  *Id.*  Finally, TXDPS argues that it is entitled to summary judgment on Carroll's FLSA overtime claim because its records demonstrate that she was appropriately compensated for her documented overtime hours.  *Id.*

## II. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up*

9

*Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party."  *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact.  *Id.* at 322.  If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required.  *Id* .  "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."  *Transamerica Ins. Co. v. Avenell* , 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25.  To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant.  *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008).  The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached.  *Moore v. Willis Ind. Sch.*

10

*Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation."  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### III.  TITLE VII DISPARATE TREATMENT

Carroll claims that Magee gave a similarly situated male, Winslow, preferential treatment with regard to scheduling, workload, and work assignments.  She also complains that Davis unfairly counseled her and treated a similarly situated male, Rivera, more favorably than her by allowing him to drive his personal vehicle to work and giving him computer access at work.  Additionally, Carroll alleges that TXDPS would not allow her to work secondary jobs on the same day on which she engaged in military training.  She claims that these actions were all violations of Title VII.

### A.  *Legal Standard*

Title VII of the Civil Rights Act of 1964 ("Title VII") makes it unlawful for an employer to discharge an employee because of their "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  A plaintiff can prove intentional discrimination through either direct or circumstantial evidence.  *See Urbano v. Continental Airlines Inc.*, 138 F.3d 204, 206 (5th Cir. 1998).  Direct evidence is evidence which, if believed, proves the fact without inference or presumption.  *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)).  When a plaintiff offers only circumstantial evidence, the *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case

of discrimination, which, if established, raises a presumption of discrimination. *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179–80 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817 (1973)).  To establish a *prima facie* case, the plaintiff must show that "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated" or the plaintiff was replaced by a non-minority. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006) (quoting *Rutherford*, 197 F.3d at 184); *Jatoi v. Hurst-Eules-Bedford Hosp. Auth.*, 807 F.2d 1214, 1219 (5th Cir. 1987).  The Fifth Circuit has held that only "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensating, satisfy the "adverse employment action" element of a *prima facie* case of discrimination. *See Hunt v. Rapides Healthcare Sys., LLC* , 277 F.3d 757, 769 (5th Cir. 2001).  The plaintiff must raise a genuine issue of material fact as to all four elements of her *prima facie* case of discrimination. *Id.*

If the plaintiff successfully establishes a *prima facie* case of discrimination, the employer must then produce a legitimate nondiscriminatory reason for its adverse employment decision. *Id.* Once the employer produces a legitimate nondiscriminatory reason, the presumption of discrimination dissipates and the burden shifts back to the plaintiff-employee to raise a genuine issue of material fact that the nondiscriminatory reason is merely pretextual in order to survive summary judgment. *Id.*  To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  A plaintiff may establish pretext by showing either (1) the reason offered by the employer is untrue, or (2) the reason is true, but the plaintiff's protected characteristic was a motivating factor in the adverse decision (the "mixed-motives" alternative). *Id.*; *Keelan v. Majestco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005).  The plaintiff bears the

ultimate burden of persuading the trier of fact, by a preponderance of the evidence, that the employer intentionally discriminated against her because of her protected status. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219–20 (5th Cir. 2001).

**B.      *Analysis***

Carroll contends that TXDPS discriminated against her because (1) Magee assigned work in the Liberty office to Winslow and did not require Winslow to report what he did there, and he did not afford Carroll that same opportunity; (2) Magee required Carroll to provide 72-hours notice of schedule changes, including sick leave, annual leave, and military leave, and did not require the same of Winslow; (3) Carroll had to do more work than Winslow, in general; (4) Magee required Carroll to return a form in connection with her FMLA leave request that was not required by the FMLA; (5) Davis unfairly counseled Carroll five times during the last quarter of 2008; (6) Davis allowed a similarly situated male, Rivera, to take leave in November 2008, but he denied Carroll's leave requests; (7) Davis provided computer access to Rivera and not her; and (8) the department did not allow Carroll to work secondary jobs on the same days that she engaged in military training.

None of the evidence offered by Carroll can be considered direct evidence of discrimination because one would have to infer that Carroll's superiors took the actions they took for discriminatory reasons. Thus, the court considers Carroll's disparate treatment claim under the *McDonnell Douglas* framework.

There is no dispute that Carroll, as a woman, is a member of a protected class, and TXDPS does not claim that Carroll is not qualified for her position. Thus, the first two prongs of her *prima facie* burden are met. The court must determine, however, if Carroll has shown that she suffered an "adverse employment action" and that a "similarly situated" male employee was treated more favorably.

13

### 1. *Similarly Situated.*

Carroll's allegations that the department would not allow her to work secondary jobs on the same day on which she engaged in military training, that Davis unfairly denied her leave request in November 2008, and that she was unfairly counseled by Davis resulting in a suspension of her STEP and secondary employment privileges are arguably "adverse employment actions" under the *McDonnell Douglas* framework, as these actions affected her pay or her ability to take leave. However, Carroll has not met her *prima facie* burden with regard to these claims by showing that a similarly situated male employee was treated more favorably. In "disparate treatment cases, the plaintiff-employee must show 'nearly identical' circumstances for employees to be considered similarly situated." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 353 (5th Cir. 2007). Carroll has not provided any evidence that a male employee of TXDPS in "nearly identical" circumstances was treated more favorably than she.

First, Carroll has not provided any evidence that a male employee was allowed to work a secondary job on the same day that he engaged in military training. Moreover, TXDPS did not allow Carroll to work a secondary job on the same day as her military training because it has a policy that prohibits this. Dkt. 33. The policy is gender neutral on its face. Dkt. 34, Exh. D at CARROLL_004745 (quoting General Manual, Chapter 7, 36.03, e: "No secondary employment requiring the use of DPS commission while an employee is on active duty with the military").[5]

---

[5] Carroll quibbles with TXDPS's characterization of military training as "active duty," citing the statutory definition of "active duty" in 38 U.S.C. § 101(21). Dkt. 38 at 26. However, Title VII does not prohibit TXDPS from having a different definition for "active duty" in its policy prohibiting secondary employment on the same day on which one is engaging in military training than the definition used in the U.S. Code. Title VII prohibits disparate treatment on members of the protected classes, and Carroll has presented no evidence of disparate application of the policy.

Second, while Carroll has presented evidence that Davis approved leave for a male trooper, Rivera, in November 2008 but denied her request for leave, she has not shown that she and Rivera were similarly situated at the time the leave requests were made.  When Carroll presented a request for time off in early November 2008, Davis denied the request and suspended her use of vacation, comp time, and/or holiday comp time until further notice.  However, he allowed Rivera to use comp time later that same month.  Dkt. 38 at 23 & Exh. A at PLAINTIFF 000320, PLAINTIFF 000356. Carroll presents copies of both her unapproved leave request and Rivera's approved leave request. *Id.*  However, Carroll has not shown that the circumstances were "nearly identical."  *See Berquist*, 500 F.3d at 353.  Carroll's leave request, which requests leave for November 20-21, 2008, is dated November 5, 2008.  Dkt. 38, Exh. A at PLAINTIFF 000320.  Rivera's leave request, which requests leave on November 26, 2008, is dated November 18, 2008.  Dkt. 38, Exh. A at PLAINTIFF 000356. Thus, Rivera's request was submitted almost two weeks after Carroll's, and he was requesting leave for a different day.  Davis's consideration of a leave request by a trooper, in general, was likely different on November 18 than it was on November 5.  The changing circumstances for consideration of leave requests at the Humble office from week to week is apparent when one notes that, on December 2, 2008, which is approximately two weeks after Davis approved Rivera's leave request, Davis approved a leave request submitted *by Carroll*.  *See* Dkt. 38 at 24 (email from Davis to Shillingburg indicating that, on December 2, 2008, he verbally approved leave requested from Carroll for December 4, 2008).  Obviously, Davis was considering different factors on December 2 than he did on November 5, since he approved Carroll's later request.  Carroll simply has not shown that the situation surrounding her denied request for leave was sufficiently similar to the situation surrounding Rivera's approved request for leave and thus has not presented a *prima facie* case of discrimination.

Carroll also has not met the similarly situated requirement with regard to her complaint about Davis's counseling, which led to the suspension of her STEP and secondary employment privileges. Davis counseled Carroll for (1) losing her handcuff key; (2) converting four days of military leave in July to vacation without first having obtained approval to do so; (3) failure to make a bank deposit upon the close of business; (4) disobeying an order not to drive her personal vehicle to work; (5) failing to conduct business in a straightforward manner; and (6) failing to report to work despite a direct order to do so. Carroll provides explanations for why she believes Davis was wrong to counsel her in each of these instances, but the only instance of counseling in which she attempts to point to a similarly situated male who did not receive counseling for the same offense is for driving her own vehicle to work. Carroll claims that Trooper Rivera, a male trooper at the Humble location, was not required to drive his patrol unit to work. *See* Dkt. 38. However, the only summary judgment evidence she presents relating to this argument is testimony from *Magee* that he does not require troopers at the *Tidwell* office to drive their patrol units to work. Dkt. 42, Exh. E at 104-05. Under the evidence on record, Davis could have required the troopers at the Humble office to drive their patrol units to work even if Magee did not require the troopers at the Tidwell office to do so, and Magee's testimony does not show that Davis required Carroll to drive her patrol unit to work while allowing Rivera to drive his personal vehicle. Thus, Carroll has not shown that a similarly situated male was treated differently with regard to being counseled for alleged violations of department rules and procedures. The counseling led to the suspension of Carroll's secondary employment and STEP privileges, which is arguably an adverse employment action, but Carroll likewise has not presented any evidence that a male who had received counseling similar to the counseling she received during the relevant time period was treated more favorably.

16

### 2.    *Adverse Employment Action.*

Carroll does present some allegations that Magee treated her differently than he treated Winslow and that Davis treated her differently than he treated Rivera, but the differences in treatment were not with regard to an "ultimate employment decision."  Specifically, with regard to her work at the Liberty office, Carroll contends that she conducted more drivers' tests than Winslow, that Magee scheduled specific time for Winslow to work on his reports without affording Carroll the same opportunity, that Magee allowed Winslow, but not Carroll, to work at the Liberty office from time to time, and that Magee required Carroll to give more advance notice of leave than Winslow. With regard to Carroll's work at the Humble office, Carroll claims that Davis allowed Rivera, but not her, to drive his personal vehicle to work and that Davis provided Rivera, but not her, with computer access.  None of these actions is an "adverse employment action" under the *McDonnell Douglas* framework. Carroll does not present any evidence of a significant difference in her workload and Winslow's, and the allowance of extra time to write reports is a relatively minor difference in treatment.[6]  Minor differences in work assignment do not constitute an adverse employment action sufficient to support a claim for discrimination.  *See Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1240 (11th Cir. 2001) (finding that two changes in work assignment that were essentially demotions but did not cause the plaintiff economic injury did not meet the statutory threshold for a Title VII discrimination claim).  Moreover, the differences in work assignments, even if not minor, were not "ultimate employment decisions," such as hiring, granting leave, discharging, promoting or compensating.

---

[6] TXDPS objects to the work records that Carroll submitted with her response as claiming that they are not authenticated.  Dkt. 46 n.1. As discussed more fully in Part VII, *infra*, TXDPS's objection is overruled.

Failing to allow Carroll to occasionally work at the Liberty office and requiring her to provide advance notice of leave likewise are not "ultimate employment decisions." Carroll's deposition testimony reveals that Carroll's inability to work occasionally in Liberty did not impact her pay, promotion potential, or reputation. Dkt. 34, Exh. A at 217:3-218:20. In fact, Carroll admitted during her deposition that the trips "didn't affect my career." Dkt. 34, Exh. A at 218:10. The only benefit of being asked to make the "Liberty run" was "time out of the office" and "time off of road tests." Dkt. 34, Exh. A at 218:14-23. Thus, the decision regarding who was able to get this time out of the office and time off of road trips was not an ultimate employment decision. With regard to the requirement that Carroll give more advance notice of leave than Winslow, Carroll does not contend that she did not receive the leave she requested; the notice requirement in and of itself is not an "ultimate employment decision."

Finally, Carroll's complaints that Davis treated Rivera more favorably than he treated her because Rivera was able to drive his own vehicle to work and had computer access do not create an issue of material fact with regard to Carroll's *prima facie* burden. Neither action is an "ultimate employment decision" under the Fifth Circuit's definition. Moreover, as discussed above, Carroll does not actually present any evidence that Davis allowed Rivera to drive his personal vehicle to work, and Carroll's conclusory allegation cannot create an issue of material fact.

### 3. FMLA

It is unclear if Carroll's allegations regarding Magee's requirement for a specific form relating to her FMLA are part of her disparate treatment claim, her hostile work environment claim, or both. If she means to assert it as part of the disparate treatment claim, she has not met her *prima facie* burden, as the requirement to submit a form was not adverse employment action under the

18

*McDonnell Douglas* framework and Carroll has not presented any evidence that a similarly situated male was treated  more favorably.

Carroll has not met her *prima facie* burden with regard to any of her allegations of disparate treatment, and under the *McDonnell Douglas* framework, the analysis need go no further.[7] TXDPS's motion for summary judgment with respect to Carroll's disparate treatment claim is GRANTED.

### III.  TITLE VII HOSTILE WORK ENVIRONMENT

Carroll claims that both Magee and Davis created hostile work environments in violation of Title VII.  Dkt. 38.  She alleges that Magee and Davis "were unrelenting in their behavior toward [her]."  Dkt. 38 at 32.  Magee allegedly interfered with leave Carroll needed under the FMLA for "uniquely female, medical ailments," and both men allegedly "created a [sic.] objectively offensive work environment that Carroll found to be both hostile and abusive."  *Id.*  Carroll claims "there was never just cause for any of the actions taken by the Department against her with regard to the complaints made against her by the two sergeants" and that they "bore false witness against her in retaliation for her complaints against them."  *Id.*

### A.  Legal Standard

The United States Supreme Court noted in *Harris v. Forklift Systems, Inc.* that "when discriminatory conduct [is] so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion, or national origin," the broad notions of Title VII are offended.  510 U.S. 17, 22, 114 S. Ct. 367 (1993).  An employee establishes a *prima facie* case of hostile work environment by showing that (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; and (4) the

---

[7] The court notes that even if Carroll had met her *prima facie* burden, TXDPS has submitted legitimate nondiscriminatory reasons for most of Carroll's allegations, and Carroll has failed to carry her ultimate burden of showing that she was treated differently because of her protected status.

harassment affected a term, condition, or privilege of her employment. *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007). "For harassment to affect a 'term, condition, or privilege of employment' it must be 'sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment.'" *Celestine v. Petroleos de Venez, SA*, 266 F.3d 343, 353 (5th Cir. 2001) (quoting *Watts v. Kroger Co.*, 170 F.3d 505, 509-10 (5th Cir. 1999)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris*, 510 U.S. at 23. The "environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so." *Faragher v. Boca Raton*, 524 U.S. 775, 786, 118 S. Ct. 2275 (1998). "An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute hostile work environment." *Lauderdale*, 512 F.3d at 163. However, "[i]ncidential, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability. Discourtesy or rudeness, 'offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment.'" *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (quoting *Faragher*, 524 U.S. at 786).

Assuming, *arguendo*, that the treatment Carroll received from Magee and Davis could be considered "harassment," Carroll has not met her burden of demonstrating an issue of material fact with regard to the third and fourth prongs of the *prima facie* case. She specifically alleges that Magee made her and three other female employees give advance notice of doctor's appointments, that Magee required her to provide extra documentation for her FMLA leave, demonstrating an "inordinate interest with the medical care and treatment of the female employees under his supervision" (Dkt. 48 at 3), and that Davis unfairly counseled her numerous times within a short time

period and even required her to come back to work after hours one time.  *See* Dkt. 38.  The court

notes that it must consider the totality of the circumstances and determine whether the evidence

presented, taken as a whole, is sufficient to support Carroll's *prima facie* burden of a hostile work

environment.  However, since Carroll points to specific instances, the court will consider each

allegation discretely and then consider the effect of the combined evidence.

      With regard to Carroll's allegation that Magee required her and three other women to give

advance notice before taking leave for doctor's appointments, Carroll has not presented an issue of

material fact indicating that Magee required advance notice because of Carroll's gender or that the

requirement affected a term or condition of her employment.  As evidence to support her claim,

Carroll points to a transcript containing testimony by Magee about Carroll's leave restrictions, which

appears to be a transcript relating to a departmental investigation of Carroll's allegations.  According

to the transcript, Magee stated that he issued the memorandum to Carroll regarding advance notice

for doctor's appointments and requiring documentation pursuant to items 6b, 1, 2, 4, 5, and 6 of the

General Manual.[8]  Dkt. 41 at CARROLL_002596.  When asked if there were any other employees

who "fell in this category in terms of using sick time," Magee responded affirmatively.  *Id.*  The

---

     [8]  Section 6b states that a "supervisor may request that an employee provide a doctor's
statement or other suitable written explanation of the reasons for the absence due to sickness or
illness or the employee or immediate family member. . . . This statement may be requested by
supervisors in those situations when, at their discretion, it is their reasonable belief that: 1) A more
clear explanation of the reason for the absence of the employee is required; and/or 2) It is necessary
to clarify the record with regard to the employee's absence; and/or . . . 4) The past record of the
employee causes the supervisor to reasonably believe that false claims against sick leave entitlements
may have been made in the past; and/or 5) It is necessary to determine FMLA designation; and/or
6) It is in the best interest of DPS to secure such documentation."  Dkt. 34, Exh. D at
CARROLL_002698-99.  The memorandum that Magee gave to Carroll in which he stated that she
must provide notice at least 72 hours before doctor's appointments states that the "documentation
will assist me in making sure that [there is] a clearer explanation of the reasons for the absences, to
clarify the record with regard to the absences, and to determine FMLA designation, if necessary."
*Id.* at CARROLL_002697.

three other employees are women.  Magee stated that he addressed the medical leave issues with these three women the same way he addressed it with Carroll—by issuing a similar memorandum and advising the chain of command.  *Id.*  While the employees to whom Magee issued these memoranda are all women, there is no indication that he issued the memoranda *because* they are women.  Rather, the memorandum presented to Carroll and Magee's testimony reveal that he issued memoranda to these women because they each met the criteria listed in the General Manual. Moreover, even if Magee did issue the memoranda "because of sex," Carroll does not meet the fourth prong of the *prima facie* burden as she has not shown that the requirement that she provide advance notice of leave was sufficiently severe or pervasive to alter the terms and conditions of her employment and create a hostile work environment.  She does not allege that the requirement caused her to not be able to take leave or that it impacted the amount of leave she requested in any way.

Carroll likewise does not present evidence sufficient to raise an issue of material fact with regard to her allegation that Magee took an inordinate interest in medical issues related to her status as a female by requiring extra documentation of a medical procedure relating to these issues.[9] Carroll has not presented any evidence, other than her conclusory allegation, that Magee required additional paperwork because she was undergoing a procedure related to her gender.[10]  Moreover, Carroll has not presented a scintilla of evidence indicating that this request affected a term or

---

[9]  TXDPS claims that Magee merely asked for paperwork to verify that Carroll's condition was a qualifying condition under the FMLA. Dkt. 33 at 15.  Carroll claims that Magee had already issued a form indicating that her condition was a qualifying event under the FMLA and that his requirement for an additional form was unnecessary. Dkt. 38 at 15-16.  The court need not resolve the dispute regarding whether the form was necessary or not, as Carroll has not asserted a claim under the FMLA, and, even if the form was not necessary, the requirement for submission of the form did not create a hostile work environment.

[10]  The briefing in this case indicates that Carroll is uncomfortable disclosing the nature of the medical procedure, so the court will merely refer to it as being related to her gender.

condition of employment.  In fact, when Carroll informed TXDPS that she was uncomfortable submitting the form to Magee, TXDPS informed Carroll that she could submit the form to her lieutenant instead.  Dkt. 34, Exh. A at 227:20-228:10.  Carroll, however, elected to give the form to Magee anyway, because his name was on it and he was at the Tidwell office, which was a more convenient location for Carroll.  *Id.* at 228:2-7.

Carroll's final factual assertion relating to her hostile work environment claim is that Davis unfairly counseled her numerous times over a short period of time.  Dkt. 38.  Carroll claims that the impact of the counseling sessions "was ultimately reflected in sub-par performance evaluations, loss of STEP, denial of secondary employment, Grand Jury investigations and the Personnel Complaint filed against her by the Department."  Dkt. 48 at 4.  TXDPS claims that counseling sessions were not severe or pervasive enough to create a hostile work environment.  TXDPS cites several cases in which courts have held that counseling sessions about substandard work performance do not constitute severe or pervasive circumstances sufficient to support a hostile work environment claim.  Dkt. 46.  Carroll attempts to distinguish these cases.  Dkt. 48.  However, whether the counseling sessions impacted a term or condition or her employment is inconsequential, as Carroll has not shown that any of the counseling she received was "because of sex."  None of the counseling topics relates to Carroll's protected status, and Carroll provides no evidence indicating that Davis singled her out for numerous counseling sessions because she is a woman.

Taken together, the facts Carroll raises do not demonstrate that she was subjected to severe or pervasive harassment "because of sex."  Certainly, toward the end of the time in question, Carroll was subjected to numerous counseling sessions by Davis, and being counseled so often likely made the environment uncomfortable.  But, an employee cannot invoke Title VII every time he or she is unhappy with his or her work environment.  Title VII is meant to protect members of specific classes

from discrimination *because of* their membership in the protected class.  Here, Carroll has not shown that any of the conduct that she claims created a hostile work environment was because she is a woman.  Accordingly, her hostile work environment claim must fail.  TXDPS's motion for summary judgment on Carroll's hostile work environment claim is GRANTED.

## IV. TITLE VII RETALIATION

Title VII's antiretaliation provision protects an employee who is discriminated against because she has "'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59, 126 S. Ct. 2405 (2006) (quoting  42 U.S.C. § 2000e-3(a)).  To establish a *prima facie* case of retaliation, a plaintiff must show: (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) a casual link existed between the protected activity and the adverse employment action.  *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 1997).  At a minimum, "in order to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity."  *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003) (citing *Medine v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)).  If the plaintiff makes a *prima facie* showing of retaliation, the burden of production shifts to the employer, which must "articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  "If the employer meets its burden of production, the plaintiff then bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real discriminatory or retaliatory purpose. . . . To carry this burden, the plaintiff must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer." *Id.*

24

Carroll notes that she filed a report of unprofessional conduct/harassment against Davis on December 8, 2008, that he learned about the report on February 5, 2009, and that she received an "unacceptable" performance evaluation from him on the same day. Dkt. 38 at 29. The performance evaluation recommended that Carroll be denied access to secondary employment opportunities, which decreased her ability to earn supplemental income. *Id.* On February 6, 2009, Garza-Jennings sent a memorandum to Carroll officially suspending her secondary employment and STEP privileges. Dkt. 34, Exh. D at CARROLL_000901. On March 2, 2009, Carroll appealed her evaluation, stating that it caused a denial of secondary employment and STEP. Dkt. 34, Exh. D at CARROLL_000898. On March 9, 2009, Garza-Jennings initiated a personnel complaint against Carroll due to her alleged flagrant and persistent violations of TXDPS rules and regulations. Dkt. 34, Exh. G. On March 10, 2009, Carroll filed her second EEOC charge of discrimination. Dkt. 34, Exh. D. Three days later, TXDPS Driver License Chief Brown requested permission to open a criminal investigation of Carroll relating to alleged misrepresentations about military leave in Carroll's leave requests in July and November 2008. Dkt. 33. The Texas Rangers investigated the alleged misrepresentations, and the evidence was presented to a Harris County grand jury twice. Dkt. 34, Exh. D. The grand jury declined to indict Carroll. Dkt. 33 at 24. Carroll claims these are serious adverse employment actions resulting from her filing a complaint against Davis. Dkt. 38. Carroll notes that the "Grand Jury charges were dropped" and TXDPS's investigation "ultimately abandoned." *Id.* (citing Dkt. 41-1 at CARROLL_004824).

Carroll clearly has met her burden with regard to the first prong of the *prima facie* case, as she has shown than she engaged in protected activity. Whether she suffered an adverse employment action as a result is not as clear. She admits that the investigations by her employer and the grand jury were closed. These actions thus did not ultimately have an adverse impact on her employment.

25

However, in a retaliation case, an adverse employment decision is "any action that 'might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *McCoy*, 492 F.3d at 559 (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 125 S. Ct. 2405 (2006)).   A reasonable worker likely would have been dissuaded from making a charge of discrimination if doing so would result in a criminal investigation and possible grand jury charges. The suspension of STEP and secondary employment privileges is also an adverse employment action because it impacted Carroll's overall compensation, and a decrease in compensation would likely dissuade a reasonable worker from making a charge of discrimination.[11]  *See* Dkt. 34, Exh. D at 82-83.

Carroll attempts to meet the causation prong by showing that these adverse actions were initiated shortly after she engaged in protected activity.  She links the suspension of her secondary employment and STEP privileges to the protected activity because these privileges were suspended shortly after she filed her EEOC complaint and because Davis gave her a negative employment evaluation on the same day that Davis allegedly found out about the protected activity.  *See* Dkt. 41-1 at CARROLL04630; Dkt. 41 at CARROLL 001316-18.  The criminal investigation was likewise initiated shortly after Carroll engaged in protected activity.

The causal link required to meet the third prong of the *prima facie* case for retaliation "is not as stringent as the 'but for' standard." *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001). TXDPS claims that temporal proximity alone is insufficient to create a genuine issue of material fact, citing *McDaniel v. Shell Oil Co.*, 350 Fed. App'x 924, 927 (5th Cir. 2009).  However, in *McDaniel*, the time that lapsed between the protected activity and the alleged adverse employment action was

---

[11]  The decrease in pay did not impact Carroll's salary from TXDPS, but she did make less money overall because she could no longer be paid to work for third parties, and she could not work extra traffic patrols to receive the federal STEP funds.

more than nine months.  *See McDaniel*, 350 Fed. App'x at 926.  The Fifth Circuit has stated that "[c]lose timing between an employee's protected activity and an adverse action against him [or her] may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).  The Fifth Circuit has held that a time lapse of five days is sufficient to provide the "causal connection" enabling a plaintiff to satisfy the third prong of the *prima facie* case of retaliation.  *See Evans*, 246 F.3d at 354.  Furthermore, district courts in this circuit have found that a time lapse of up to four months is sufficient.  *See Weeks v. NationsBank, N.A.*, No. CIV.A. 3:98-CV-1352M, 2000 WL 341257, at *3 (N.D. Tex. Mar. 30, 2000) (citing *Garrett v. Constar Inc.*, No. Civ.A 3:97-CV-2575, 1999 WL 354239, at *5 (N.D. Tex. May 25, 1999)); *see also Evans*, 246 F.3d at 354 (citing *Weeks* with approval).  Here, Carroll presents evidence that she received the negative performance evaluation that led to the suspension of her secondary employment and STEP privileges on *the same day* that Davis actually found out about the charge, and within two months of filing the charge.  Similarly, TXDPS admits that Brown requested permission to open the criminal investigation three days after Carroll filed her formal complaint with the EEOC.  The court finds that this temporal proximity is sufficient to satisfy the causation requirement of Carroll's *prima facie* burden.

Since Carroll has met her *prima facie* burden, TXDPS must present a legitimate, nondiscriminatory, and nonretaliatory reason for its actions.  *See Evans*, 246 F.3d at 354.  When "there is a close timing between an employee's protected activity and an adverse employment action, the employer must offer 'a legitimate, nondiscriminatory reason that explains both the adverse action *and the timing*.'"  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999) (quoting *Swanson*, 110 F.3d at 1188).  TXDPS claims that the negative performance evaluation and suspension of STEP and secondary employment privileges were legitimate and nondiscriminatory

responses to "a series of performance issues and [Carroll's] negative attitude toward her primary job." Dkt. 46 at 7. Davis and the management officials who advised him regarding the content of the performance evaluation, Shillingburg and Garza-Jennings, supported the performance evaluation with references to counseling records and a departmental memo.[12]   *See* Dkt. 41 at CARROLL_001316-18. TXDPS likewise supported the interoffice memorandum suspending Carroll's secondary employment privileges with references to the numerous counseling records reflecting Carroll's alleged violations of departmental policies and procedures. *See* Dkt. 34, Exh. D at 7156-57. Additionally, Garza-Jennings claims that she "intended the suspension to get [Carroll's] attention and to provide her an incentive to focus more on her primary responsibility as a commissioned trooper employed by DPS and less on her secondary responsibilities as an Army reservist and private-sector employee."[13]   Dkt. 34, Exh. G at 9. As far as the timing of the evaluation, it coincides with the normal evaluation timeframe for TXDPS employees. *Compare* Dkt. 34, Exh. D at CARROLL_004372-75 (2009 evaluation, dated February 10, 2010), *with* Dkt. 41 at CARROLL_001316-18 (2008 evaluation, dated February 5, 2009). TXDPS has met its burden of production with regard to a legitimate nondiscriminatory reason for suspending Carroll's secondary employment privileges and for the otherwise suspicious timing of the suspension.

TXDPS also has produced a legitimate, nondiscriminatory and nonretaliatory reason for Garza-Jennings's initiation of the personnel complaint against Carroll, which led to Brown's

---

[12] Lt. Scott Shillingburg, who also wrote the memorandum suspending Carroll's secondary employment privileges, recommended in light of the numerous times Carroll had been counseled, that Carroll be rated "unacceptable" in the category of "compliance with rules" and "some improvement needed" in the category "accepts directions." *See* Dkt. 34, Exh. G at 7; Dkt. 34, Exh. D at 7156-57. Captain Garza-Jennings recommended that Carroll be rated "unacceptable" in both categories. Dkt. 34, Exh. G at 7-8.

[13] Carroll has objected to portions of Garza-Jennings' affidavit, but she has not objected to the admissibility of this portion of the affidavit.

initiation of a criminal investigation and the eventual pursuit of grand jury charges. Garza-Jennings claims that she executed a C-1 personnel complaint on March 9, 2008, after learning that Carroll disregarded instructions to report to duty on February 4 and 5, 2009. Dkt. 34, Exh. G. Garza-Jennings claims that she felt compelled to initiate the complaint due to Carroll's "flagrant and persistent violation of Department rules and regulations and obvious contempt for her supervisors and chain of command." *Id.* TXDPS's burden is one of production, not persuasion, and this reason is legitimate and nonretaliatory. TXDPS has, therefore, met its burden of production with regard to Garza-Jennings's personnel complaint.

TXDPS has likewise met its burden of production with regard to Carroll's allegation that the initiation of the criminal investigation and the grand jury investigation were retaliatory. Brown initiated the criminal investigation, which led to the grand jury declining to indict Carroll, after the investigation into Garza-Jennings's personnel action began. Dkt. 34, Exh. G Among other complaints, Garza-Jennings alleged that Carroll took military leave on November 20, 2008, and did not report to military duty. Dkt. 41-1 at CARROLL_004792. According to the Texas Ranger who conducted the investigation, TXDPS initiated the investigation after the administrative investigation relating to Garza-Jennings's personnel complaint revealed that Carroll "possibly falsified government documents in relation to secondary employment and military leave." *Id.* at CARROLL_004815; Dkt. 33. The Texas Ranger notes that an "extensive investigation of DPS and U.S. Army documents revealed Trooper CARROLL utilized paid military leave on two occasions when there was no record of her reporting to military duty."[14] Dkt. 41-1 at CARROLL_004815.

---

[14] The dates to which the Texas Ranger is referring are February 6 and 9, 2009. Carroll later amended her weekly report and time card to reflect that she had taken vacation, rather than military leave, on February 9, 2009. Dkt. 41-1. Carroll also presented evidence to the grand jury showing that she was eventually paid for military duty on February 6 and February 9, 2009. *Id.* Moreover, the U.S. Army also provided a sign-in log showing that Carroll signed in for military duty on those

Thus, TXDPS has produced a legitimate, nondiscriminatory, and nonretaliatory reason for initiating the criminal investigation and grand jury investigation. There is also a legitimate, nondiscriminatory, and nonretaliatory reason for the timing. TXDPS determined that the Carroll possibly falsified documents after it started the administrative investigation of Garza-Jennings's personnel complaint, which Garza-Jennings filed on March 9, 2009, shortly before Brown requested permission to begin a criminal investigation on March 13, 2009.

Carroll bears the ultimate burden of persuasion, and in order to survive summary judgment, she must present an issue of material fact demonstrating that TXDPS's asserted reasons for its adverse employment actions are not true and instead are pretext for a real discriminatory or retaliatory purpose. Carroll claims that TXDPS's asserted reasons cannot justify its "extraordinary actions in seeking a criminal indictment against her, when it had actual possession of documents and materials which established the charges were false." Dkt. 48 at 8. Carroll does not, however, point to the actual documents to which she refers. *See id.* Moreover, the court's review of the record supports TXDPS's claim that Brown initiated the criminal investigation because the administrative investigation revealed that Carroll "was abusing paid military leave to work secondary employment." Dkt. 41-1 at CARROLL_004815. In July 2008, Carroll took military leave on the same day that she was engaged in secondary employment. She later changed the military leave to vacation, and Davis counseled her for changing her military leave to vacation leave without first obtaining approval from him. Dkt. 38. Then, on November 18, 2008, Carroll again engaged in secondary employment on a date that she was on military leave. Dkt. 34, Exh. A at 175-180. Garza-Jennings's personnel

---

two dates. *Id.* Cell phone records also revealed that Carroll "was in the vicinity of Ellington Field on both dates." *Id.* This evidence was uncovered *after* Jennings-Garza filed the personnel complaint and Brown initiated the criminal investigation, so it is not relevant to TXDPS's reasons for taking these actions.

complaint also alleges that Carroll took military leave on November 20, 2008, but did not report to military duty.  Dkt. 41-1 at CARROLL_004792.  Carroll states that she later changed her weekly hours reports to indicate that she had taken vacation rather than military leave on some of the dates at issue, but changing the type of leave afterwards does not change the fact that Carroll did, indeed, engage in secondary employment on dates on which she originally requested military leave.  Carroll's allegation of pretext is merely conclusory; she has not shown that TXDPS had evidence suggesting that Davis was not truthful in his account of Carroll's apparent abuse of the military leave/secondary employment policy.  Thus, Carroll has not met her burden, and TXDPS's motion for summary judgment with respect to Carroll's retaliation claim is GRANTED.

## V. Fair Labor Standards Act: Failure to Pay Overtime

Carroll alleges in her Second Amended Complaint that she was a non-exempt employee who was "routinely and intentionally denied overtime pay for hours worked in excess of the maximum hours for non-exempt employees, as provided for under the Fair Labor Standards Act."  Dkt. 20.  TXDPS submitted evidence from its payroll records demonstrating that Carroll received compensation for all of the documented and approved overtime hours she actually worked during the time in question.  Dkt. 33, Dkt. 34, Exh. F.  Carroll did not address this argument in her response.  Thus, she did not raise an issue of material fact, and her Fair Labor Standards Act ("FLSA") claim must be dismissed.  TXDPS's motion for summary judgment with regard to Carroll's FLSA claim is GRANTED.

## VI. Plaintiff's Motion to Strike Garza-Jennings Affidavit

Carroll moves to strike paragraphs 8, 9, 10, and 12-16 of the affidavit of Norma Garza-Jennings (Dkt. 34, Exh. G) as inadmissible hearsay.  Dkt. 38.  Carroll claims that Garza-Jennings based her conclusions in these paragraphs on observations made by Magee, Davis, and Lt. Kellye

Turner.  *Id.*  Carroll specifically notes that the statements of Turner are not subject to cross examination.

TXDPS argues that the statements are made to show TXDPS's state of mind or that they are derived from documents that fall under the business records exception.  Dkt. 45.  Additionally, TXDPS argues that Carroll cannot rely on the business records that help her case but ask that the business records that harm her case be excluded.  *Id.*

The court did not find it necessary to rely on the objected-to paragraphs in the Garza-Jennings affidavit in reaching its conclusions.  Thus, there is no need to reach Carroll's objections, and the motion is DENIED AS MOOT.

## VII.  TXDPS MOTION TO STRIKE WORK RECORDS

Carroll relies on Winslow's work records to demonstrate that she conducted more driving tests than Winslow did and that Winslow was able to work at the Liberty office.  Dkt. 38.  TXDPS moves to strike the work records because they were not obtained through discovery and thus cannot be authenticated.  Dkt. 46 n.1.  Carroll claims that the work records were authenticated in Magee's deposition, but she does not provide the testimony.  Dkt. 48, n.1.  Carroll also claims that the records "should have been produced by Defendant, as part of its Fed. R. Civ. P. 26(a)(1) disclosures."  *Id.*  Whether the documents should have been produced or not is inconsequential if the documents are not authenticated.  However, since TXDPS relies on the records in its reply to demonstrate that Winslow and Carroll had roughly equivalent workloads, *see* Dkt. 46 at 1, the court OVERRULES TXDPS's motion to strike.

## VIII. CONCLUSION

TXDPS's motion for summary judgment is GRANTED.  Carroll's claims are DISMISSED WITH PREJUDICE.  Carroll's motion to strike is DENIED AS MOOT, and TXDPS's motion to strike is OVERRULED.

It is SO ORDERED.

Signed at Houston, Texas on March 23, 2011.

_____
Gray H. Miller
United States District Judge